25-1319-cr
*United States v. Malakhov*

# United States Court of Appeals
# for the Second Circuit

August Term 2026
Argued: September 21, 2026
Decided: November 12, 2026
No. 25-1319-cr

UNITED STATES OF AMERICA,

*Appellee*,

*v.*

ARKADY MALAKHOV,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Western District of New York,
No. 22 Cr. 6093, Frank P. Geraci, *Judge*.

Before: CABRANES, LYNCH, and BIANCO, *Circuit Judges*.

Defendant-Appellant Arkady Malakhov, the CEO of Solid Cell, Inc. ("Solid Cell"), applied for and was awarded a grant from the National Science Foundation ("NSF") to undertake a

scientific research project. After receiving two disbursements from NSF of $100,000 each, Malakhov spent a portion of that money on non-project-related expenses. For this conduct, Malakhov pled guilty to a misdemeanor for converting the money to his own use in violation of 18 U.S.C. § 641. At sentencing, the district court sentenced him to a term of probation and ordered him to pay $200,000 in restitution to NSF. On appeal, Malakhov argues that this order of restitution amounts to an abuse of discretion because (1) restitution for a misdemeanor violation of Section 641 is statutorily limited to $1,000, and (2) the district court ordered restitution for purported losses that did not arise from the offense of conviction.

We disagree with Malakhov's first argument but agree with his second. We conclude that restitution for Malakhov's misdemeanor offense is not statutorily limited to $1,000, but that the district court erred in ordering restitution for losses arising from conduct other than that which underlies his conversion offense.

Accordingly, we **VACATE** that part of the judgment ordering $200,000 in restitution and **REMAND** the case for the limited purpose of reconsideration of the restitution award in a manner consistent with this opinion.

MELISSA M. MARANGOLA (Monica J. Richards, *on the brief*), Assistant United States Attorneys, *for* Michael DiGiacomo, United States Attorney for the Western District of New York, Buffalo, New York, *for* Appellee.

KATHRYN S. AUSTIN, Federal Public Defender's Office, Western District of New

York, Rochester, New York, *for* Defendant-Appellant.

---

JOSEPH F. BIANCO, *Circuit Judge*:

Defendant-Appellant Arkady Malakhov, the CEO of Solid Cell, Inc. ("Solid Cell"), applied for and was awarded a grant from the National Science Foundation ("NSF") to undertake a scientific research project. After receiving two disbursements from NSF of $100,000 each, Malakhov spent a portion of that money on non-project-related expenses. For this conduct, Malakhov pled guilty to a misdemeanor for converting the money to his own use in violation of 18 U.S.C. § 641. At sentencing, the district court sentenced him to a term of probation and ordered him to pay $200,000 in restitution to NSF. On appeal, Malakhov argues that this order of restitution amounts to an abuse of discretion because (1) restitution for a misdemeanor violation of Section 641 is statutorily limited to $1,000, and (2) the district court ordered restitution for purported losses that did not arise from the offense of conviction.

We disagree with Malakhov's first argument but agree with his second. We conclude that restitution for Malakhov's misdemeanor offense is not statutorily limited to $1,000, but that the district court erred in ordering restitution for losses arising from conduct other than that which underlies his conversion offense.

Accordingly, we **VACATE** that part of the judgment ordering $200,000 in restitution and **REMAND** the case for the limited purpose of reconsideration of the restitution award in a manner consistent with this opinion.

## BACKGROUND

### I. Factual Background

NSF is an independent agency of the United States government that supports fundamental research in science and engineering through grants and other means. NSF—along with other agencies—participates in the Small Business Innovation Research ("SBIR") program, which is a congressionally mandated program intended to support scientific advancement and technological innovation by small businesses. *See* Small Business Innovation Development Act of 1982, Pub. L. No. 97-219, § 2(b), 96 Stat. 217, 217. Under the SBIR program, a portion of a government agency's research and development effort is reserved for awards to small businesses that are more than fifty percent directly owned and controlled by one or more U.S. citizens or permanent resident aliens. *See* 13 C.F.R. § 121.702(a)(1)(i).[1] The SBIR program is divided into three phases. Phase I grants are intended to determine "the scientific and technical merit and feasibility of ideas that appear to have commercial potential."[2] 15 U.S.C. § 638(e)(4)(A). At the time relevant to this case, NSF SBIR grantees were eligible to receive up to $225,000 to undertake a Phase I project. For each SBIR grant, the applicant small business must

---

[1] There are other eligibility rules if the applicant small business is in turn owned and directed by other corporate entities, is the product of a joint venture between entities, or is organized under other less common ownership structures. *See* 13 C.F.R. § 121.702(a)(1)(ii)–(iii), (2)–(4). Those rules are not relevant here.

[2] Phase II grants seek to further the "commercial potential" of projects that have already proved their scientific and technical merit and feasibility. 15 U.S.C. § 638(e)(4)(B). Phase III grants are designed to facilitate "work that derives from, extends, or completes efforts" that began under Phases I and II. *Id.* § 638(e)(4)(C).

designate a principal investigator ("PI"), who is the individual responsible for leading the project. *See* 42 C.F.R. § 52.2.

Pursuant to the SBIR program, in 2016, NSF issued a solicitation seeking proposals for Phase I grant projects. The solicitation also detailed various eligibility requirements, including the following:

> **Who May Serve as PI:**
>
> The primary employment of the Principal Investigator (PI) must be with the small business concern at the time of award and for the duration of the award, unless a new PI is named. . . . As such, the PI must have a legal right to work for the proposing company in the US, as evidenced by citizenship, permanent residency or an appropriate visa. . . . A PI may be primarily employed at another organization at the time of *submission*, as long as he or she is primarily employed at the proposing small business at the time of award.

App'x at 172–73 (emphasis in original). The solicitation further required proposals to set forth a detailed, itemized budget (up to $225,000) identifying specific anticipated line items, including salaries for the PI and other personnel, equipment, travel, and fringe benefits.

In response to NSF's solicitation, on December 6, 2016, Malakhov submitted a proposal on behalf of Solid Cell. The proposed project, for which Malakhov sought the maximum of $225,000 from NSF, was entitled: "SBIR Phase I: Integrated Thermoelectric Heat Exchanger (iTEG-HX) for Carbon Neutral Electricity Production through Recovery of Cold Energy from Regasification of LNG." PSR ¶ 26. Malakhov identified Yuriy Lobunets as the PI for the proposed project. At the time of submission, Lobunets was not a U.S. citizen or permanent resident alien and was not authorized to work in the United

States for Solid Cell. When submitting the proposal, Malakhov agreed "to accept the obligation to comply with NSF award terms and conditions if an award is made as a result of this application." *Id.* On April 26, 2017, in response to requests by NSF for additional information, Malakhov sent NSF a signed "Funding Agreement Certification," dated April 25, 2017, certifying that he had reviewed and verified birth certificates, naturalization papers, or passports showing that any individuals Solid Cell relied upon to meet the eligibility requirements of the SBIR program were U.S. citizens or permanent resident aliens in the United States.

On July 10, 2017, NSF issued an award notice letter to Solid Cell, advising that NSF had awarded a $225,000 grant to support the project. The award letter also noted that Solid Cell was entitled to a fee for the project of $14,702, which could be used for any purpose.

The day after receiving the award letter (July 11, 2017), Malakhov requested payment of $100,000 from NSF. In doing so, he certified that:

> [T]he expenditures, disbursements, and cash receipts associated with the payment request were for the purposes and objectives set forth in the solicitation, proposal, and award letter, and complied with the terms and conditions of the award; and
>
> that the PI's primary employment was with Solid Cell, Inc., and that he was currently available to perform the proposed work.

PSR ¶ 31. However, at the time of Malakhov's payment request, Solid Cell's PI was not available to work on the project because he was neither authorized to work in the United States nor physically present in the United States. Within days, NSF authorized the U.S. Department of the Treasury to disburse the

requested payment, and Solid Cell received it. The same sequence repeated on or about September 1, 2017: Malakhov requested another $100,000, made the same certifications, and received the money from the government.

After receiving the money from the government, Malakhov spent a portion of it on expenses unrelated to the project, including his personal expenses. For example, Solid Cell spent $40,000 repaying business loans from others; $30,000 in payments to Malakhov himself (including payroll checks to another employee that were endorsed back to Malakhov); $29,000 in payments to employees (and others) for services prior to starting any work on the project; $15,000 on rent; $4,718.82 to pay an invoice from the University of Rochester for an unrelated project; and at least $2,900 in credit card payments traced to Malakhov's personal accounts.

Meanwhile, on September 19, 2017, Lobunets, Solid Cell's PI, filed a Form I-129 Petition for a Nonimmigrant Worker. On October 10, 2017, that petition was granted and the PI was issued a visa.

On October 30, 2017, Malakhov emailed an NSF program director, advising that "we may have broken the rules in that [the PI] did not have work authorization in the US on the date we were officially awarded the grant." *Id.* ¶ 37. After the program director responded with questions, on November 1, 2017, Malakhov replied that: (1) the PI was not yet in the United States; (2) the PI would be arriving on November 9, 2017; and (3) Solid Cell had "not actually started the planned work." *Id.* ¶ 38. Despite this acknowledgement that work on the project had not begun, as of November 8, 2017—the day before the PI was scheduled to arrive in the United States—the Solid Cell bank account that had

received the $200,000[3] from the government had a balance of $1,289.59.

## II. Procedural History

On July 14, 2022, Malakhov was charged in an indictment with six counts:

1. Count One: Wire fraud, in violation of 18 U.S.C. §§ 1343 & 2, for, *inter alia*, falsely representing to NSF the PI's immigration status and ability to work on the project, and further falsely representing that the money Solid Cell received from the government would be used for the purposes set forth in the solicitation, proposal, and award letter in compliance with the terms and conditions of the award.

2. Count Two: Making and using a false document knowing it contained a false statement, in violation of 18 U.S.C. § 1001(a)(3), for falsely certifying, in the April 25, 2017 Funding Agreement Certification, that he had reviewed and verified birth certificates, naturalization papers, or

---

[3] Although the grant was for a total amount of $225,000, Solid Cell only requested disbursement of $200,000 because, under the terms of the grant, NSF withholds $25,000 until a final report is submitted and accepted. According to Malakhov, "[the PI] traveled to the United States to work on the grant, albeit later than anticipated, and . . . Solid Cell completed the grant project on time" and attempted to submit a final report to NSF "at the conclusion of the grant period that detailed its research and findings." Appellant's Br. at 9. Malakhov provided a copy of that report to the district court as part of his sentencing submissions. Malakhov told the district court at sentencing that he was unable to submit the final report to NSF because NSF had disabled his account before the due date for that report. In any event, NSF did not disburse the remaining $25,000 from the grant.

passports showing that any individuals Solid Cell relied upon to meet the eligibility requirements of the SBIR program were U.S. citizens or permanent resident aliens.

3. Count Three: A similar false document charge for falsely certifying, in the July 11, 2017 payment request, that (a) "the expenditures, disbursements, and cash receipts associated with the payment request were for the purposes and objectives set forth in the solicitation, proposal, and award letter, and complied with the terms and conditions of the award"; and (b) "that the PI's primary employment was with Solid Cell, Inc., and that he was currently available to perform the proposed work." App'x at 29–30.

4. Count Four: A similar false document charge for making identical false certifications in the payment request he submitted on or about August 30, 2017.

5. Count Five: Concealing a material fact, in violation of 18 U.S.C. § 1001(a)(1), for not disclosing to NSF, in the October and November 2017 email communications, that Malakhov had already requested $200,000 in grant funds and spent almost all of those funds despite not having begun work on the project.

6. Count Six: Another false document charge for falsely representing, on June 29, 2018, that Solid Cell had paid the full amount owed to a collaborating research institution with respect to an unrelated project.

On April 12, 2024, the government dismissed Counts Two and Six, and on August 19, 2024, the government dismissed Count Five.

On November 21, 2024, Malakhov pled guilty, pursuant to a plea agreement with the government, to an information containing a single misdemeanor count of conversion, in

violation of 18 U.S.C. § 641.[4] The misdemeanor information provides in relevant part:

> Between on or about July 11, 2017, and continuing through on or about November 8, 2017, in the Western District of New York, the defendant, ARKADY MALAKHOV, did knowingly and willfully convert to his use, and convey without authority, money belonging to the United States, specifically, the National Science Foundation, . . . with the intention of depriving the United States of the use and benefit of the money.

App'x at 37. In the plea agreement, Malakhov agreed to the following factual basis for the plea:

> On or about July 11, 2017, in the Western District of New York, the defendant transmitted a request to NSF for payment of $100,000 of the grant funding. The defendant's request for funding caused NSF to transfer $100,000 to Solid Cell, Inc.'s bank account, which the defendant controlled. Between on or about July 12, 2017, and on or about November 8, 2017, the defendant converted a portion of the NSF grant funds to his own use and, knowing that he did not have the authority to do so, conveyed this NSF money to other parties for purposes unrelated to the Project[.]

*Id.* at 40. Malakhov also agreed that he engaged in identical conduct with respect to the August 30, 2017 disbursement request. *Id.*

At a change-of-plea hearing, Malakhov allocuted that, after he received each $100,000 disbursement, he "drew down the money to the bank account from the National Science Foundation, and prior to starting the project, some of those moneys [he] spent on business expenses that weren't directly related to that project."

---

[4] At sentencing, the remaining counts in the indictment were dismissed.

*Id.* at 58 (regarding the July 11, 2017 disbursement request); *see also id.* at 59 (regarding the August 30, 2017 disbursement request, stating that "[a]s with the previous funds, we had not started the project yet and some of those moneys I spent on other business expenses that were not directly related to the project").

Before sentencing, the parties disputed the proper amount of restitution that Malakhov owed to NSF.[5] According to the government, the proper amount of restitution was "the full amount of NSF grant money diverted by the defendant: $200,000." *Id.* at 77. Under the government's theory, "the full value of [the] fraudulently obtained grants is the appropriate" measure of loss (and thus restitution). *Id.*; *see also id.* at 191–92 (the government arguing at sentencing that NSF is "owed that 200 grand back because they never would have given it if they had not been lied to by the defendant").

Malakhov, however, argued that restitution for misdemeanor violations of Section 641 is necessarily limited by statute to $1,000 and that NSF's actual loss in this case was $0 because Solid Cell ultimately performed approximately $232,976 worth of research and development on the project. *Id.* at 97–100.

In a written decision issued before sentencing, the district court rejected Malakhov's argument that restitution was limited by statute to $1,000 because "there is no logical inconsistency between (a) [Malakhov's] admission that the grants had *some* value, for purposes of his plea to a misdemeanor violation of Section 641, and (b) the Court's finding that the grants had

[5] Before the district court, the parties also disputed the amount of NSF's loss for the purposes of calculating Malakhov's advisory sentencing range under the United States Sentencing Guidelines, but, on appeal, Malakhov does not challenge the district court's calculation of his Guidelines range.

$200,000 in value, for purposes of restitution." *See United States v. Malakhov*, No. 22-CR-6093, 2025 WL 1224349, at *4 (W.D.N.Y. Apr. 29, 2025) (emphasis in original). The district court also determined that the proper calculation of Malakhov's restitution obligation was $200,000 because "the actual loss to NSF was the $200,000 it was fraudulently induced to pay." *Id.* at *3 (internal quotation marks and citation omitted).

At sentencing and in the written judgment, the district court adhered to its written decision and ordered Malakhov to pay $200,000 to NSF in restitution. Malakhov was also sentenced to a three-year term of probation. This appeal followed.

## DISCUSSION

On appeal, Malakhov advances two principal arguments for concluding that the district court's imposition of restitution was an abuse of discretion. First, he contends that restitution for a misdemeanor violation of Section 641 is statutorily limited to $1,000. Second, he argues that the district court awarded NSF restitution for purported losses that did not arise from his conversion offense.[6]

### I. Applicable Law of Restitution

A sentencing court's power to order restitution "depends upon, and is necessarily circumscribed by, statute." *United States v. Zangari*, 677 F.3d 86, 91 (2d Cir. 2012). Here, the relevant statute is the Mandatory Victims Restitution Act ("MVRA"). The MVRA requires district courts to order defendants convicted of certain offenses (including conversion of government property) to pay

---

[6] Malakhov also proposes two other reasons why the imposition of restitution was an abuse of discretion, which we do not address for the reasons discussed *infra*.

restitution to their victims "in the full amount of each victim's losses." 18 U.S.C. § 3664(f)(1)(A); *id.* § 3663A(a)(1). However, "[r]estitution is authorized only for losses that were directly caused by the conduct composing the offense of conviction and only for the victim's actual loss." *United States v. Marino*, 654 F.3d 310, 319–20 (2d Cir. 2011) (citation modified). Therefore, when reviewing an order of restitution, the first step is to determine the "nature and scope" of the offense of conviction. *United States v. Goodrich*, 12 F.4th 219, 228 (2d Cir. 2021). "Where a defendant has pled guilty to an offense, we look to the materials supporting the plea—such as the allocution statement, the plea agreement, and the [charging instrument]"—to ascertain that nature and scope. *Id.* at 230.[7]

"The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense" is on the government. 18 U.S.C. § 3664(e). Moreover, the district court must resolve any factual dispute about the amount and type of restitution "by the preponderance of the evidence." *Id.*; *accord United States v. Bahel*, 662 F.3d 610, 647 (2d Cir. 2011).

"We review a restitution order's legal conclusions de novo and its findings of fact for clear error, reversing only if in our view the trial court abused its discretion." *United States v. Afriyie*, 27 F.4th 161, 166 (2d Cir. 2022) (internal quotation marks and citation

---

[7] Because restitution is limited to the conduct composing the offense of conviction and is thus bound by the nature and scope of that offense, restitution can, in some cases, be more limited than the calculation of "loss" under the United States Sentencing Guidelines, which is derived from the broader concept of "relevant conduct." *See United States v. Vilar*, 729 F.3d 62, 97 (2d Cir. 2013) ("[R]estitution is not permitted for loss caused by relevant conduct, even though such conduct may be properly included in [an] offense level calculation under the Sentencing Guidelines."(internal quotation marks and citation omitted)).

omitted).

## II. Restitution Under Section 641

According to Malakhov, the district court erred by ordering him to pay $200,000 because, although the MVRA requires courts to order restitution in the full amount of victims' losses, restitution for his offense of conviction is statutorily limited to $1,000 by the misdemeanor provision of Section 641. We disagree.

"In statutory interpretation, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself," which "includes reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Seife v. FDA*, 43 F.4th 231, 239 (2d Cir. 2022) (internal quotation marks and citations omitted); *accord United States v. Al Kassar*, 660 F.3d 108, 124–25 (2d Cir. 2011); *United States v. Piervinanzi*, 23 F.3d 670, 677 (2d Cir. 1994). "If the meaning is plain, the inquiry ends there." *United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016). "If we find the statutory provision ambiguous, however, we then turn to canons of statutory construction for assistance in interpreting the statute." *Id.* (internal quotation marks and citation omitted); *see also Boyle v. United States*, 556 U.S. 938, 950 (2009) ("Because the statutory language is clear, there is no need to reach [the] remaining arguments based on statutory purpose, legislative history, or the rule of lenity.").

Here, Malakhov pled guilty to a misdemeanor violation of 18 U.S.C. § 641. That statute provides:

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property

> made or being made under contract for the United States or any department or agency thereof; [. . .]
>
> Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.

18 U.S.C. § 641. As the second paragraph indicates, Section 641 encompasses both felony and misdemeanor violations.

This Court helpfully interpreted Section 641 in *United States v. Lee*, 833 F.3d 56 (2d Cir. 2016). *Lee* was a felony Section 641 case in which the defendant was prosecuted for stealing plastic pallets from the Postal Service, which the trial evidence established caused a loss to the government of at least $225,000. *Id.* at 60–62. The indictment did not allege that the value of the pallets was over $1,000, but the jury was instructed that to find the defendant guilty, it needed to find that the value of the property stolen was over $1,000. *Id.* at 61–63. After he was convicted, the defendant argued on appeal that, because the indictment did not allege that the value of the property was over $1,000, his conviction for the Section 641 felony violated the Grand Jury Clause of the Fifth Amendment. *Id.* at 63–64. This Court held that value exceeding $1,000 is an element of a Section 641 felony, and thus it was error (although harmless error) for the indictment not to allege value over $1,000. *Id.* at 64–73.

That holding is not directly implicated here, but in reaching this conclusion, we discussed the relationship between the misdemeanor and felony violations of Section 641, and the required elements for each. To establish a violation of Section 641, the government had to prove the following four essential

elements: "(1) stealing or converting, (2) with intent to steal or convert, (3) a 'thing of value' (4) that belongs to the government." *Id.* at 65. We further explained that

> [i]f the government at trial proves all four of the above elements—including that the "thing" stolen had some value—any value, even if small—it has proven a violation of § 641. Proof that the "thing" simply had some value, without proof that the value exceeded $1,000, would show a complete crime upon the fewest facts—a misdemeanor. And if the value of the "thing" is shown at trial to have been in excess of $1,000, the government has proven a felony.

*Id.* at 65–66.

Thus, under this Court's reading of Section 641 in *Lee*, a misdemeanor violation of the statute does not require proof that the value of the stolen property at issue is less than $1,000 because the dollar amount of the "thing of value" is not an element of the misdemeanor offense. Instead, the misdemeanor provision covers any Section 641 violation where the government has shown that the converted property had "some value," no matter how high that value is, unless the government (1) charges the offense as a felony by alleging that the value of the stolen property exceeded $1,000, and (2) proves that element beyond a reasonable doubt to a jury or establishes that amount by virtue of the guilty plea.

Even though the statutory language in Section 641 does not limit the government's ability to obtain the full value of the converted property as restitution under the MVRA, such a limitation could separately exist, under the MVRA's definition of "victim," if the factual basis for the offense of conviction in the guilty plea specifies a more limited value. *See United States v. Vilar*, 729 F.3d 62, 97 (2d Cir. 2013) ("The MVRA's definition of

'victim' reflects an important limiting principle for restitution awards—namely, that Congress has authorize[d] an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction." (alteration in original) (internal quotation marks and citation omitted)); *see also Goodrich*, 12 F.4th at 230 (looking to plea allocution, plea agreement, and charging instrument "to ascertain the 'offense of conviction' for restitution purposes"). However, that is not the case here.

First, the information was labeled as a "MISDEMEANOR INFORMATION," but did not reference any dollar amount in its charging language. Instead, it charged that Malakhov "did knowingly and willfully convert to his use, and convey without authority, money belonging to the United States, specifically, the National Science Foundation, an agency within the executive branch of the United States government, with the intention of depriving the United States of the use and benefit of the money." App'x at 37.

Second, the amount of the loss was not established by his plea agreement or his plea allocution, nor was the loss capped at $1,000 in those materials. In particular, the plea agreement mentions that NSF sent Malakhov a total of $200,000, but then states that: (1) with respect to the $100,000 sent to him in July 2017, "[he] converted *a portion of the NSF grant funds* to his own use and, knowing that he did not have the authority to do so, conveyed this NSF money to other parties for purposes unrelated to the Project," *id.* at 40 (emphasis added); and (2) with respect to the $100,000 sent to him on or about August 30, 2017, "[he] subsequently converted *a portion of this money* to his own use and, knowing that he did not have the authority to do so, conveyed this NSF money to other parties for purposes unrelated to the Project," *id.* (emphasis added). Then, during Malakhov's change-of-plea hearing, he allocuted that, after receiving each of the

$100,000 payments, he "drew down the money to the bank account from the [NSF], and prior to starting the project, *some of those moneys* I spent on business expenses that weren't directly related to that project." *Id.* at 58 (emphasis added); *see also id.* at 59.

In short, although proving a "thing of value" was converted is an element of a Section 641 offense, the precise amount of the converted property is not an element of the misdemeanor offense and neither Malakhov's misdemeanor information nor his guilty plea limited the offense of conviction to converted property that was valued at $1,000 or less. We therefore agree with the district court that "there is no logical inconsistency between (a) [Malakhov's] admission that the grants had *some* value, for purposes of his plea to a misdemeanor violation of Section 641, and (b) the Court's finding that the grants had $200,000 in value, for purposes of restitution." *Malakhov*, 2025 WL 1224349, at *4.

Malakhov nonetheless argues that, according to *Lee*, Section 641's misdemeanor provision establishes a "ceiling value" for such a conviction. Appellant's Br. at 18 (quoting *Lee*, 833 F.3d at 65). But Malakhov's interpretation of the reference to a "ceiling value" in *Lee* requires that phrase to be read in isolation, rather than in the context in which the panel used that phrase. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979) (noting that statements in judicial opinions must be "read [i]n context"); *see also Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, *J.*, dissenting) ("[J]udicial opinions are not statutes, and we don't dissect them word-by-word as if they were.").

Here is that context: On appeal in *Lee*, the government argued "that the value of the stolen property is not an element of [a Section 641] felony [offense]" and, "because § 641's language describing the felony violation contains no reference to value[, and] value is mentioned only in connection with

eligibility for mitigation, the default violation is a felony violation, and . . . the possibility of misdemeanor exposure constitutes an exception based on mitigating facts." *Lee*, 833 F.3d at 65 (internal quotation marks and citations omitted). The Court explained that:

> The apparent effect of this interpretation would be that if the government wished to prosecute a defendant for a misdemeanor violation of § 641 it would have to prove that the property stolen had a value of $1,000 or less, but that to prosecute him for a § 641 felony, it need not prove that the value of the property stolen exceeded $1,000.

*Id.*

After noting that such a result would be "counterintuitive," *id.*, the Court proceeded to demonstrate how the text and elements of Section 641 foreclosed the government's argument:

> The "value" of the "thing" taken—whether great or small—is an element of the offense. If the "thing" knowingly and intentionally taken from the government had no value, § 641 was not violated. Thus, the fact that a separate paragraph of § 641, setting out penalties for the prohibited conduct, *specifies a ceiling value in its misdemeanor clause* but does not expressly mention value in its felony clause does not mean that value is not an element of the felony. The "value," in "thing of value," is integral to the prohibition stated in the first paragraph of § 641.

*Id.* (emphasis added). Therefore, when read in context, the Court's mention of a "ceiling value" in *Lee* was merely rejecting the government's argument that proving a "thing" taken had some value is not an element of a felony violation of Section 641. In doing so, the Court certainly did not purport to limit the amount of restitution that could be ordered for a misdemeanor violation of Section 641.

In sum, because the elements of a misdemeanor violation of Section 641 do not necessarily limit the value of the converted property to $1,000 or less, and Malakhov's offense of conviction (based on the misdemeanor information and guilty plea materials) did not establish that the value of the converted property was $1,000 or less, we reject Malakhov's argument that restitution was definitionally limited to $1,000 in this case.[8]

## III. Whether the District Court Awarded Restitution for Losses Not Arising from Malakhov's Conversion

Next, Malakhov contends that, even if restitution is not limited to $1,000, the district court still erred because it ordered restitution based on conduct that was not part of his offense of conviction. We agree.

The district court imposed $200,000 in restitution, reasoning that Malakhov "converted $200,000 in grant funds to which he had no present entitlement" and therefore "the actual loss to NSF

---

[8] We thus find unpersuasive Malakhov's reliance on two non-binding decisions addressing this issue: *United States v. Payne*, No. 09-MJ-517, 2009 WL 5062099 (S.D. Ohio Dec. 16, 2009) and *United States v. Mingo Lamar*, 295 F. Supp. 3d 376 (S.D.N.Y. 2018). In each case, the magistrate judge relied on a premise we reject today—that a misdemeanor violation of Section 641 necessarily entails some finding that the value of the relevant converted property is $1,000 or less. *See Payne*, 2009 WL 5062099, at *3 ("By definition, that [misdemeanor] offense cannot involve a theft of government property in an amount in excess of $1,000."); *Mingo Lamar*, 295 F. Supp. 3d at 380–81 (relying in large part on *Payne* and suggesting that a misdemeanor violation of Section 641 is "limited in monetary scope"). Moreover, *Mingo Lamar* is further distinguishable because the relevant misdemeanor information specifically charged that the defendant stole "property and money not exceeding $1,000 in value." *Mingo Lamar*, 295 F. Supp. 3d at 380 (quoting the misdemeanor information).

was the $200,000 'it was fraudulently induced to pay.'" *Malakhov*, 2025 WL 1224349, at *3 (quoting *United States v. Davis*, 53 F.4th 833, 850 (5th Cir. 2022)). Thus, the district court determined that there should be "no credit for the expenses that [Malakhov] incurred when he later performed the promised research." *Id.* The government asks us to affirm along the same lines. *See* Appellee's Br. at 24 ("[T]he NSF would not have paid *any* of the distributed money to Malakhov if it had known that Malakhov was not in a position to perform the research when [he] applied or requested the distributions." (emphasis in original)); *see also id.* at 22 ("[A]ny reports Malakhov provided [to NSF] were an oversight mechanism as to which the government did not benefit or otherwise use. Thus, that Malakhov tried to later submit a report, long after he converted the funds, did not confer the benefit of the bargain to the NSF.").

In effect then, both the district court and the government conceptualize Malakhov's offense of conviction as akin to fraudulent inducement. *See Kousisis v. United States*, 605 U.S. 114, 118 (2025) (upholding the "fraudulent-inducement theory" of wire fraud, under which "a defendant commits federal fraud whenever he uses a material misstatement to trick a victim into a contract that requires handing over her money or property—regardless of whether the fraudster, who often provides something in return, seeks to cause the victim *net* pecuniary loss" (emphasis in original)). According to the government, the full value of the disbursements is the proper measure of restitution because, in requesting the two disbursements from NSF, Malakhov falsely certified that the PI was available to begin work on the project when in reality, he was not even authorized to be in the United States yet. *See* Appellee's Br. at 24.

The problem with this theory of restitution, however, is that restitution is only available as to the offense of conviction, and

fraudulent inducement—based on Malakhov's alleged false statement regarding the availability of the PI—was not part of his offense of conviction. As noted *supra*, in determining the nature and scope of the offense of conviction in the guilty plea context for restitution purposes, "we look to the materials supporting the plea," such as the charging instrument, the plea agreement, and the defendant's allocution at the change-of-plea proceeding. *See Goodrich*, 12 F.4th at 230.

Here, all three of those items demonstrate that fraudulent inducement was *not* part of the offense conduct under Section 641, to which Malakhov pled guilty. Instead, as described above, the misdemeanor information, plea agreement, and plea colloquy all make clear that Malakhov admitted to converting a portion of the funds he received from NSF *after* he received them by spending them on non-project-related expenses. *See* App'x at 37 (the misdemeanor information); *id.* at 40 (the plea agreement stating that Malakhov "converted a portion of [the money received from NSF] to his own use . . . for purposes unrelated to the Project"); *id.* at 58 (the plea transcript in which Malakhov admitted that he "drew down the money . . . from the [NSF], and prior to starting the project, some of those moneys I spent on business expenses that weren't directly related to that project"); *see also id.* at 59 (similar). Indeed, as Malakhov correctly notes, prior to his guilty plea, the government voluntarily dismissed Count Two of the indictment, which was based on Malakhov's alleged lie in Solid Cell's grant application regarding the immigration status of the PI.[9] Put another way, Malakhov admitted in his guilty plea to

---

9 At sentencing, Malakhov also objected to the paragraph in the PSR relating to that allegation. *See* App'x at 100 ("Paragraph 47 [of the PSR] indicates that Mr. Malakhov 'misrepresented and concealed from NSF' the fact that Dr. Lobunets was neither a United States citizen [n]or a

putting the grant funds to *unauthorized uses*, but the district court calculated restitution as if he had admitted to *fraudulently inducing* payment of the funds in the first place.[10] Rather than relying on "the materials supporting the plea," *Goodrich*, 12 F.4th at 230, the district court relied on Malakhov's "conce[ssion]," made by his attorney when objecting to the revised PSR, "that he

---

permanent resident alien or otherwise authorized to work in the United States. This is factually incorrect. Mr. Malakhov made no representations to the NSF concerning Dr. Lobunets' immigration status other than to advise that his arrival had been delayed.").

10 When calculating loss amount under the United States Sentencing Guidelines, courts in similar situations distinguish between "unintended recipients" of government grants or benefits, and "unintended uses" of the same. *See* U.S.S.G. § 2B1.1 cmt. n.3(E)(ii); *see also United States v. Agrawal*, 97 F.4th 421, 435–41 (6th Cir. 2024); *United States v. Douleh*, 239 F. App'x 694, 694–95 (2d Cir. 2007) (summary order). Under this so-called "government-benefits rule," if government benefits are obtained by unintended recipients, the proper loss calculation is the total amount of grants that the defendant received. *Agrawal*, 97 F.4th at 436–37. For example, "if an ineligible disability-benefits applicant falsely claims to be unemployed (an eligibility requirement for some disability benefits), the loss will equal the full amount of benefits because the applicant should have 'obtained' nothing." *Id.* at 437. By contrast, if government benefits are diverted to unauthorized uses—for example, if "a welfare recipient lies about her income to obtain $150 worth of food stamps (rather than the $100 to which her income legally entitles her)"—"the loss will equal the portion 'diverted' to the unintended use (the $50 worth of excess food stamps)." *Id.* Although the analogy to this case is not perfect—both because SBIR grants differ from public-assistance programs in that they do not legally entitle recipients to a certain amount of money, *id.* at 436, and because the calculation of restitution is not identical to the calculation of loss amount under the Guidelines, *see United States v. Certified Env't Servs., Inc.*, 753 F.3d 72, 102 (2d Cir. 2014)—our decision in this case comports with the common-sense principles underlying the government-benefits rule.

falsely certified Dr. Lobunets's availability to work." *Malakhov*, 2025 WL 1224349, at *2 (citing App'x at 152–53). Therefore, the district court erred by ordering restitution premised on a theory of criminal liability not supported by "the specific conduct that is the basis of the offense of conviction." *Goodrich*, 12 F.4th at 228 (internal quotation marks and citation omitted).

The district court's and the government's reliance on out-of-circuit cases in which the defendant admitted to or was found guilty of fraud are thus unpersuasive. *See United States v. Agrawal*, 97 F.4th 421, 428, 437–42 (6th Cir. 2024) (affirming an order of restitution for the full amount of an SBIR Phase II grant where the defendant was convicted of wire fraud offenses for making false statements in the grant application and the government "would not have awarded [the defendant] a Phase II grant if it had known of [a] forged letter"); *Davis*, 53 F.4th at 839–40, 850 (affirming an order of restitution for the full value of grants given by a government entity where the defendant was convicted of wire fraud offenses because the government "would not have paid for anything absent [the defendant's] fraudulent misrepresentations"); *United States v. Aldissi*, 758 F. App'x 694, 702, 714 (11th Cir. 2018) (unpublished) (affirming an order of restitution for the full value of SBIR and other government grants where the defendants were convicted of various fraud offenses for lying in the grant applications); *United States v. Jha*, 613 F. App'x 212, 213, 215 (4th Cir. 2015) (per curiam) (unpublished) (affirming an order of restitution for the full value of government grants where the defendant was convicted of various fraud and false statement offenses).

Even further afield is the government's reliance on various civil cases brought under the False Claims Act. As the name implies, the False Claims Act creates civil liability for knowingly presenting "*a false or fraudulent* claim for payment or approval."

31 U.S.C. § 3729(a)(1)(A) (emphasis added). Therefore, like the criminal cases involving restitution discussed above, in each False Claims Act case upon which the government relies, the defendant was found to have lied or committed fraud in order to obtain a grant that the government would not otherwise have awarded. *See, e.g.*, *United States ex rel. Longhi v. United States*, 575 F.3d 458, 461–62, 473 (5th Cir. 2009) (affirming damages in "the [full] amount the government actually paid to the [d]efendants" where the defendants engaged in "an elaborate pattern of false statements to secure [SBIR] research grants from the federal government"); *see also United States v. Anghaie*, 633 F. App'x 514, 515, 517, 519 (11th Cir. 2015) (unpublished) (affirming damages in "the full amount of the [SBIR and other] research contracts" where the defendants "lied about why they deserved [the] funding" and thus "the government would not have paid the [defendants] at all but for their fraud").

In sum, we conclude that the district court erred in framing Malakhov's offense as akin to fraudulent inducement or unauthorized receipt of funds from NSF, and awarding restitution of $200,000 to NSF based on that offense, because that is not the offense that the misdemeanor information, plea agreement, and plea colloquy established.

To be sure, the government may still be entitled to an award of restitution based on Malakhov's offense of conviction: converting a portion of the funds received from NSF by spending them on non-project-related expenses. However, restitution based on that theory of criminal liability was sharply disputed by the parties at sentencing, with each side relying upon its own expert report. In particular, in advance of sentencing, Malakhov argued that, notwithstanding his improper diversion of grant money, he later expended substantial monies on behalf of the project and, "[a]t the conclusion of the grant period, Solid Cell

prepared a thorough final report detailing its research and findings." App'x at 96. According to Malakhov, "[a]lthough the final report was never accepted by the NSF, the substantial work involved in preparing the report was expended." *Id.* In support of this position, Malakhov submitted a report by a forensic accountant that he argued demonstrated that "Solid Cell incurred actual costs of $232,976" in connection with the NSF project and, because the NSF only disbursed a total of $200,000, "Solid Cell ultimately spent almost $33,000 more on the project than it received from the NSF." *Id.* at 88.

For its part, the government countered with the report of a forensic accountant for NSF, who challenged Solid Cell's accounting as "contrary to Federal cost principles, the terms of the NSF award, and the NSF award certifications," and who opined that no costs claimed by Malakhov were allowable. PSR ¶¶ 43–44. According to the government, "the NSF expert found that the report did not adequately demonstrate that any of the costs were allowable under the terms of the grant and that the good faith effort value was unallowable 'because Solid Cell did not demonstrate . . . that a cost was actually incurred for these purported good faith efforts.'" Appellee's Br. at 6–7 (quoting PSR ¶ 45). Thus, "the NSF expert concluded that, at most, $60,149 of the amount attributed to the NSF award should be considered for an allowability determination." *Id.* at 7.

Because the district court relied solely on Malakhov's purported fraudulent inducement to calculate restitution, it did not consider these submissions and, thus, we remand this case for the district court to determine whether, and to what extent, NSF suffered an actual loss from the conduct underlying Malakhov's offense of conviction for purposes of restitution. In doing so, we leave it to the district court to address in the first instance other issues that it left unaddressed because of the way it

conceptualized Malakhov's offense of conviction, including the extent of Malakhov's misspending and whether and to what extent the calculation of NSF's actual loss should take into account Solid Cell's expenditures on the project and the report submitted to NSF. *See Havens v. James*, 76 F.4th 103, 123 (2d Cir. 2023) ("We are a court of review, not of first view." (internal quotation marks and citation omitted)).

## CONCLUSION

For the foregoing reasons, we **VACATE** that part of the judgment ordering $200,000 in restitution and **REMAND** the case for the limited purpose of reconsideration of the restitution award in a manner consistent with this opinion.